No. 22-55001

―――――――――――――――――――――――――――――――――――――――

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
―――――――――――――――――――――――――――――――――――――――


AARON KHERIATY, M.D.,

*Plaintiff-Appellant.*

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, a corporation;
MICHAEL V. DRAKE, M.D., in his official capacity as President of the
University of California,

*Defendants-Appellees.*
―――――――――――

On Appeal from the United States District Court
for the Central District of California
No. 8:21-cv-01367 JVS (KESx)
Hon. James V. Selna


**APPELLANT'S OPENING BRIEF**

Aaron Siri
Siri & Glimstad LLP
200 Park Avenue,
17th Floor
New York, NY 10166
Tel: (212) 532-1091
Fax: (646) 417-5967
aaron@sirillp.com

Caroline Tucker
Siri & Glimstad LLP
700 S. Flower Street
Suite 1000
Los Angeles, CA 90017
Tel: (213)376-3739
Fax: (646) 417-5967
ctucker@sirillp.com


*Attorneys for Plaintiff-Appellant* AARON KHERIATY, M.D.

## DISCLOSURE STATEMENT

Plaintiffs are not required to submit a Disclosure Statement pursuant to FRAP 26.1.

Dated: April 4, 2022

By: _____/s/ Aaron Siri_____
Aaron Siri
Siri & Glimstad LLP
200 Park Avenue, 17th Floor
New York, NY 10166Tel: (212) 532-1091
Fax: (646) 417-5967
aaron@sirillp.com

Caroline Tucker
Siri & Glimstad LLP
700 S. Flower Street
Suite 1000
Los Angeles, CA 90017
Tel: (213)376-3739
ctucker@sirillp.com

*Attorneys for Plaintiff-Appellant*
AARON KHERIATY, M.D.

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES ................................................................v

INTRODUCTION...............................................................................1

JURISDICTIONAL STATEMENT.....................................................4

STATEMENT OF ISSUES PRESENTED ..........................................5

STATEMENT REGARDING NINTH CIRCUIT RULE 28-2.7 ........5

STATEMENT OF THE CASE..............................................................6

    Appellant Contracts COVID-19 .................................................6

    Infection with COVID-19 Virus Provides Robust Long-Term
    Immunity................................................................................6

    Natural Immunity is Greater than 99% Effective ....................7

    Vaccines Provide Less Effective Immunity ...............................8

    COVID-19 Vaccines Do Not Prevent Transmission of the Virus,
    but Natural Immunity Does Prevent Transmission ............10

    COVID-19 Vaccinations Present a Greater Risk to People with
    Natural Immunity ...............................................................11

    The UC Mandate Prohibits Naturally Immune Individuals from
    Returning to Campus..........................................................12

    Relevant Proceedings Below ...................................................13

ii

District Court Grants Motion for Judgment on the Pleadings..............14

SUMMARY OF THE ARGUMENT ....................................................16

STANDARD OF REVIEW ..................................................................18

ARGUMENT ..........................................................................................18

I. THE JUDGMENT ON THE PLEADINGS ORDER SHOULD BE
   REVERSED BECAUSE THE DISTRICT COURT LOOKED WELL
   BEYOND THE CONFINES OF RULE 12(C)...........................................18

   A. Standard on a Rule 12(c) Motion....................................................18

   B. The District Court Improperly Failed to Accept as True the
      Allegations in the Complaint........................................................20

   C. The District Court's Application of the Judicial Notice Doctrine
      Abused the Rule 12(c) Standard ....................................................22

      1. The District Court's reliance on the government websites
         was improper .........................................................................22

      2. The fact that the District Court needed to take into
         consideration so many outside documents should have taken
         the motion outside the bounds of Rule 12(c) ........................24

II. THE JUDGMENT ON THE PLEADINGS ORDER SHOULD BE
    REVERSED BECAUSE THE DISTRICT COURT SHOULD HAVE
    APPLIED STRICT SCRUTINY TO INVALIDATE THE UC
    MANDATE..............................................................................................26

    A. Requiring A Vaccination Is An Invasion Of Appellant's
       Constitutionally Protected Right To Bodily Integrity, Right To
       Control Medical Treatment, And Right To Refuse Medical
       Treatment........................................................................................28

    B. Whether The Intrusion Into An Individual's Bodily Integrity
       Implicates A Fundamental Right Can Only Be Determined By
       Balancing The State's Needs Against The Individual's Rights ....33

    **C.**    **The District Court Incorrectly Used A Categorical Method, Rather Than The Jacobson Balancing Test, For Determining Whether A Fundamental Right Was Violated By The UC Mandate**...............................................................................38

    **D.**    **If The District Court Had Employed The Balancing Test Here, It Would Have Established That Naturally Immune Individuals Have A Fundamental Right To Refuse Vaccination**......................40

    **E.**    **The UC Mandate Cannot Survive Strict Scrutiny Analysis Based On The Facts Alleged In The Complaint**........................................43

**III.**    **THE JUDGMENT ON THE PLEADINGS ORDER SHOULD BE REVERSED BECAUSE EVEN UNDER THE RATIONAL BASIS STANDARD, THE DISTRICT COURT SHOULD HAVE HELD THAT THE ALLEGATIONS IN THE COMPLAINT STILL PRESENT A PLAUSIBLE CAUSE OF ACTION**..................................44

    **A.**    **The Standard for Rational Basis Review on a Motion to Dismiss is Not "Toothless"**...........................................................................44

    **B.**    **The Available Facts Do Not Establish the UC Mandate's Rational Relationship to the University's Goals**............................................46

**CONCLUSION**...........................................................................................51

**STATEMENT OF RELATED CASES**.............................................................52

**CERTIFICATE OF COMPLIANCE**................................................................53

**CERTIFICATE OF SERVICE**......................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akahoshi v. Bank of Am., N.A.*,
    No. CV 15-818 DSF (GJSx),
    2015 U.S. Dist. LEXIS 102835 (C.D. Cal. Aug. 5, 2015) ...........................23

*Creative Care, Inc. v. Connecticut Gen. Life Ins. Co.*,
    2019 WL 6354366 (C.D. Cal. Aug. 8, 2019) ...............................................19

*Cruzan by Cruzan v. Director, Missouri Dept. of Health*,
    497 U.S. 261 (1990)………………………………………………..passim

*Dragovich v. U.S. Dept. of the Treasury,*
    848 F. Supp. 2d 1091 (N.D. Cal. 2012)……………………………………46

*Galvan v. Duffie*,
    807 F. App'x 696 (9th Cir. 2020)...................................................................31

*Guertin v. State,*
    912 F.3d 907 (6th Cir. 2019)………………………………………..passim

*Gilligan v. Jamco Dev. Corp.,*
    108 F.3d 246 (9th Cir. 1997)………………………………………………20

*Haas v. County of El Dorado*,
    No. 2:12-CV-00265-MCE,
    2012 WL 1414115 (E.D. Cal. Apr. 23, 2012) ....................................... 32, 35

*Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*,
    896 F.2d 1542 (9th Cir. 1989) ............................................................. 19, 25

*Harris v. Univ. of Massachusetts, Lowell*,
    21-CV-11244-DJC,
    2021 WL 3848012 (D. Mass. Aug. 27, 2021) .............................................41

*Heinrich ex rel. Heinrich v. Sweet,*
    62 F. Supp. 2d 282 (D. Mass. 1999)……………………………..30, 34, 39

*Herrera v. Zumiez, Inc.*,
    953 F.3d 1063 (9th Cir. 2020) .....................................................................18

*HSH, Inc. v. City of El Cajon*,
   44 F. Supp. 3d 996 (S.D. Cal. 2014) ............................................................45

*Immaculate Heart Cent. School v. New York State Pub. High School Athletic
   Ass'n*, 797 F. Supp. 2d 204 (NDNY 2011)....................................................45

*In re Cincinnati Radiation Litig.*,
   874 F. Supp. 796 (S.D. Ohio 1995) ..............................................................32

*Jacobson v. AEG Capital Corp.*,
   50 F.3d 1493 (9th Cir. 1995) ………………………………………………25

*Jacobson v. Commonwealth of Massachusetts*,
   197 U.S. 11 (1905)…………………………………………………….passim

*Jones v. Magallon*,
   No. 115CV01897DADMJSPC,
   2016 WL 1162669 (E.D. Cal. Mar. 24, 2016).............................................35

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018)………………………………………...24, 49

*Klaassen v. Trustees of Indiana Univ.*,
   No. 1:21-CV-238 DRL,
   2021 WL 3073926 (N.D. Ind. July 18, 2021) ...............................................41

*Lee v City of Los Angeles*,
   250 F.3d 688 (9th Cir. 2001) ................................................................ 23, 24

*Liberian Community Assn. of Connecticut v. Lamont*,
   970 F.3d 174 (2d Cir. 2020)…………………………………………..37

*Magney v. County of Humboldt*,
   No. 17-CV-02389-HSG,
   2018 WL 6460506 (N.D. Cal. Dec. 10, 2018) .............................................31

*Matter of Fosmire v. Nicoleau*,
   75 N.Y.2d 218 (1990)....................................................................................36

*Merriman v. Lizarraga*,
   No. 217CV1701MCEKJNP,
   2017 WL 4340041 (E.D. Cal. Sept. 29, 2017) .............................................35

*Missouri v. McNeely*,
   569 U.S. 141 (2013)………………………………………………………30

*Peoples v. Machuca*,
  No. 19-CV-05468-YGR (PR),
  2021 WL 1845533 (N.D. Cal. Mar. 19, 2021) ............................................19

*Plumeau v. School Dist. No. 40 County of Yamhill*,
  130 F.3d 432 (9th Cir. 1997) ........................................................................34

*Prairie Farms, L.L.C. v. Town of Colorado City*,
  No. CV-16-08232-PCT-DLR,
  2017 WL 10237887, at (D. Ariz. Apr. 10, 2017) ........................................19

*Qwest Communications Corp. v. City of Berkely*,
  208 F.R.D. 288 (2002) ........................................................................... 22, 25

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020)……………………………………………………41, 28

*Sable Commc'ns of Cal. v. FCC*,
  492 U.S. 115 (1989)......................................................................................43

*Sacramento County Retired Employees Ass'n v. County of Sacramento*,
  No. CIV S-11-0355 KJM,
  2012 WL 1082807 (E.D. Cal. Mar. 31, 2012)................................. 44, 45, 51

*Sanchez v. City of Fresno*,
  914 F. Supp. 2d 1079 (E.D. Cal. 2012)……………………………………….26

*Saulsberry v. Maricopa Cty.*,
  151 F. Supp. 2d 1109 (D. Ariz. 2001) .................................................... 31, 33

*Snow v. Corizon Healthcare*,
  842 Fed. Appx. 135 (9th Cir. 2021) ............................................................32

*Snyder v. Robinson*,
  No. 2:21-cv-00328-BLW,
  2021 US Dist LEXIS 232116 (D. Idaho Dec. 1, 2021)......................... 31, 32

*Stamas v. County of Madera*,
  No. CV F 09–0753 LJO SMS,
  2010 WL 2556560 (E.D. Cal. June 21, 2010) ...................................... 48, 50

*Stillman v. Column 5 Consulting,*
  *L.L.C.*, No. 3:14-CV-8207-HRH,
  2016 WL 3254211 (D. Ariz. June 14, 2016).................................................25

*U.S. v. Playboy Entm't Grp.*,
  529 U.S. 803 (2000)......................................................................................43

*Upper Deck Co. v. Panini Am., Inc.*,
No. 20CV185-GPC(KSC),
2021 WL 1388630 (S.D. Cal. Apr. 13, 2021) ...............................................19

*Washington v. Glucksberg*,
521 U.S. 702 (1997)……………………………………………………26, 42

*Washington v. Harper*,
494 U.S. 210 (1990)......................................................................................30

*Williams v. Brown*,
No. 6:21-CV-01332-AA,
2021 WL 4894264 (D. Or. Oct. 19, 2021) ...................................................41

*Williams v. DeLeon*,
No. 115CV00543SKOPC,
2018 WL 4352902, at *9 (E.D. Cal. Sept. 11, 2018………………………..34

*Williams v. Paramo*,
17CV2475-CAB (NLS),
2019 WL 354704 (S.D. Cal. Jan. 29, 2019) .................................... 45, 47, 50

*Williams v. Paramo*,
17CV2475-CAB-NLS,
2019 WL 1409855 (S.D. Cal. Mar. 28, 2019)...............................................45

*Williams v. Santiago*,
No. 116CV01065MJSPC,
2016 WL 6494268 (E.D. Cal. Nov. 1, 2016) ...............................................34

## Statutes

U.S. Const. amend. XIV .............................................................................5

## INTRODUCTION

Appellant was a professor at the University of California, Irvine. ("**UC**" or the "**University**").  He previously contracted COVID-19 and, following his recovery, he now enjoys robust natural immunity against becoming either reinfected with the virus or transmitting the virus to others.  Numerous studies have concluded that this natural immunity is far superior to the immunity created through vaccination against COVID-19 because natural immunity is more effective at preventing reinfection and transmission of the virus to others.  In fact, even though there have been millions of documented breakthrough cases where vaccinated individuals have become reinfected and transmitted the virus to others, there has never been even a single documented case of someone with natural immunity transmitting the virus to anyone else.  Nevertheless, UC enacted a policy whereby individuals who have been vaccinated against COVID-19 can return to any of the UC campuses, but UC refused to allow naturally immune individuals like Appellant to return to campus (the "**Vaccine Policy**" or "**UC Mandate**").

Appellant filed this action because, by treating him differently from individuals with vaccine-induced immunity, UC violated both his substantive due process rights and his equal protection rights.  Appellee filed a motion for judgment on the pleadings after the District Court denied Appellant's motion for a

1

preliminary injunction. The District Court then granted the motion for judgment on the pleadings based on numerous improper grounds.

In filing the motion for judgment on the pleadings, Appellee attached more than 100 pages of exhibits, the majority of which were never cited to or even mentioned in the Complaint. Motions for judgment on the pleadings are supposed to be resolved by accepting the pleaded facts as true, and not by looking at extrinsic evidence. Nevertheless, even though the District Court claimed it was only taking judicial notice of the existence of most of those documents, it relied on statements in those documents that were refuted by allegations in the Complaint. The very fact that the District Court needed to rely on these documents shows that the Complaint alone does state plausible claims, and that extrinsic evidence was necessary to defeat those claims. Therefore, the motion for judgment on the pleadings should have been denied on those grounds alone.

Furthermore, the allegations in the Complaint are more than sufficient to show that Appellant stated a plausible claim for violation of his substantive due process and equal protection rights. The Complaint presents numerous factual allegations establishing that natural immunity provides better protection, not only for the individual who contracted COVID-19, but also for everyone around that individual because naturally immune individuals do not readily transmit the virus, unlike individuals with vaccine-induced immunity. The Complaint further alleges

that natural immunity is lifelong, whereas vaccine-induced immunity wanes over time. Assuming those facts to be true for purposes of this motion, as the District Court should have done, there was no way for the District Court to find that UC has a rational basis, let alone a compelling justification, for permitting vaccinated individuals on campus, but not permitting naturally immune individuals to join them. Nor did the facts in the Complaint allow the District Court to establish that requiring Appellant to be vaccinated against his preferences will improve campus safety.

For these reasons, as explained below, the District Court should have denied Appellee's motion for judgment on the pleadings. Because it failed to do so, Appellant now asks this Court to reverse the District Court's Judgment on the Pleadings Order, and to remand this action for further proceedings.

## JURISDICTIONAL STATEMENT

This matter is an appeal by Appellant, Plaintiff Aaron Kheriaty, M.D., from the order of the District Court for the Central District of California, entered on December 8, 2021, in which the District Court granted the motion for judgment on the pleadings filed by Appellee, Defendant Michael Drake, M.D. (ER_004-018.) The District Court had jurisdiction pursuant to, *inter alia*, 28 U.S.C. § 1331. (ER_193 ¶ 15.) This Court has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291, because this is an appeal from a final decision of the District Court granting Defendants' motion for judgment on the pleadings and terminating the case. (ER_004-018.)

Appellant timely filed a notice of appeal on January 3, 2022. F.R.A.P 3(a)(1). (ER_216-235.)

## STATEMENT OF ISSUES PRESENTED

Whether the District Court improperly granted Appellee's motion for judgment on the pleadings, where Appellant pled that he has natural immunity to COVID-19, which is superior to the immunity conferred by a COVID-19 vaccine, and the District Court: (1) improperly failed to accept as true the allegations in the Complaint and instead accepted as true statements made in external documents submitted by Appellee; (2) wrongly refused to apply strict scrutiny to review whether the UC Mandate violated Appellant's due process and equal protection rights; and (3) mistakenly found that the UC Mandate's exclusion of naturally immune individuals was rationally related to campus safety even though the Complaint alleged that permitting vaccinated individuals on campus presented more of a risk to the campus community than would naturally immune individuals.

## STATEMENT REGARDING NINTH CIRCUIT RULE 28-2.7

The Fourteenth Amendment, Section 1, to the United States Constitution (U.S. Const. amend. XIV, §1) provides in pertinent part: No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## STATEMENT OF THE CASE

**Appellant Contracts COVID-19**

Appellant was a professor at the University of California, Irvine ("**UCI**") School of Medicine and the director of the Medical Ethics Program at UCI Health. (ER_193 ¶ 17.)  He contracted COVID-19 in July 2020, which was confirmed by PCR testing, and he experienced many of the common symptoms associated with COVID-19, including loss of taste and smell.  (*Id.* ¶ 18.)  Appellant then fully recovered.  (*Id.*)

**Infection with COVID-19 Virus Provides Robust Long-Term Immunity**

The human immune system consists of an enormously diverse repertoire of B cells – precursors of antibody-secreting plasma cells – and T cells with a nearly unlimited capacity to recognize and 'adapt' to previously unseen pathogens. (ER_195 ¶ 24.)  As explained by Dr. Ryan Cole, a Mayo Clinic-trained pathologist, "Yes, our antibody levels drop over time, however, scientifically, the memory B cells that make antibodies have been proven to be present in our lymph nodes and bone marrow."  Dr. Cole further explains, "They are primed and ready to produce a broad array of antibodies upon…exposure."  (*Id*. ¶ 25.)

Immunologic studies of individuals who have recovered from the COVID-19 virus demonstrate that these individuals developed sustained, broad, and durable immunity and robust B cell and T-cell memory to the virus, which protect

them from reinfection. (ER_196 ¶ 26.) In other words, natural immunity to the COVID-19 virus continues to be present and effective even after antibody levels, detectable by lab tests, wane over time. (*Id.*)

**Natural Immunity is Greater than 99% Effective**

In a study of monkeys that were deliberately re-exposed to the COVID-19 virus after having COVID-19, *none* of them were re-infected. (*Id.*) Likewise, since the COVID-19 virus first appeared in the United States, out of the 120.2 million individuals who have been infected with the virus, doctors and scientists have not identified **any** naturally immune individual that was re-infected with and transmitted this virus to anyone. (*Id.* ¶¶ 28-29.)

The natural immunity produced by the closely related virus, SARS-CoV-1, is lifelong, which supports the conclusion that that the immunity from SARS-CoV-2, the COVID-19 virus, is also lifelong. (*Id.* ¶ 27.) As explained by an infectious-disease physician and professor at the University of California ("**UC**"): "Natural immunity after COVID-19 infection is likely lifelong, extrapolating from data on other coronaviruses that cause severe illness, SARS and MERS." (*Id.*)

Consistent with these findings, in a five-month study looking at reinfection rates in employees of the Cleveland Clinic Health System, out of the 1,359 workers who were previously infected with the COVID-19 virus, not one subject who remained unvaccinated was reinfected with the virus. (ER_197 ¶ 30.) Likewise,

Irish researchers reviewed eleven cohort studies with over 600,000 recovered COVID-19 patients who were followed up with over ten months. (*Id.*) They found the reinfection rate to be 0.27% "with no study reporting an increase in the risk of reinfection over time." (*Id.*) Nor did their review identify a single case where the naturally immune subjects were reinfected and then transmitted the virus to another person. (*Id.*) Based on this data, it is apparent that natural immunity is greater than 99% effective at preventing reinfection, and 100% effective at preventing transmission. (ER_195 ¶ 23, ER_197-198 ¶32.)

**Vaccines Provide Less Effective Immunity**

In contrast to natural immunity, vaccine-induced immunity is no greater than between 67% and 95% effective against disease, depending on the COVID-19 vaccine, at preventing symptoms. (ER_197-198 ¶ 32.) In clinical trials, at best, the Pfizer vaccine had initial efficacy against disease of 95%, the Moderna vaccine had efficacy of 94.5%, and the J&J vaccine had efficacy of approximately 67%. (*Id.*) The COVID-19 vaccines have been considerably less effective in the real world against disease and especially against infection. (*Id.*) Thus, the efficacy of the vaccines are all far less than the greater than the 99% efficacy shown for naturally immune individuals. (*Id.*)

Vaccines have never achieved the same level of protection as the immunity conferred from natural infection with a virus. (ER_198 ¶ 33.) Even the best

vaccines do not confer immunity to all recipients. (*Id.*)  Furthermore, the temporary immunity created by any vaccine typically wanes over time.  (*Id*.)

Even within the UC community there have been concerns regarding so-called "breakthrough cases" where vaccinated individuals contract the COVID-19 virus.  (ER_200 ¶ 36.)  This includes a July 27, 2021 email to UCI directors stating that because of these breakthrough cases, "we will not be returning to the classrooms as had been expected[.]" (*Id.*)  This indicates that there was a sufficiently alarming number of breakthrough cases among vaccinated individuals that it necessitated notice to the UCI School of Medicine and protocol changes, while no such notice has been necessary for reinfections among naturally immune individuals.  (*Id.* ¶ 37.)  What is happening at UCI is similarly being seen nationwide.  (*Id.* ¶ 38.)

The superior nature of natural immunity following infection also can be seen in multiple scientific studies.  In an outbreak of COVID-19 among gold mine workers in French Guiana, 60% of the fully vaccinated workers were infected while **none** of the individuals with a prior COVID-19 infection were infected. (ER_199-200 ¶ 35.)  Similarly, a study looking at the population of Israel found that those with prior natural infection had a higher rate of protection from infection, hospitalization, and severe illness than those that had immunity from the COVID-19 vaccine.  (*Id.*)  Another report from Israel found a sixfold rate of

COVID-19 infection among vaccinated individuals when compared to naturally immune individuals.  (*Id.*)

**COVID-19 Vaccines Do Not Prevent Transmission of the Virus, but Natural Immunity Does Prevent Transmission**

Natural immunity prevents a virus from being able to replicate and shed in a naturally immune individual.  (ER_201 ¶ 40.)  In contrast, COVID-19 vaccines appear to reduce symptoms, but still permit recipients to become infected with and transmit the virus.  (*Id.*)  This differential can be seen in studies of monkeys, where vaccinated monkeys still became infected and exhibited virus in their noses, but naturally immune monkeys experienced no reinfection.  (*Id.* ¶ 41.)

A CDC investigation of an outbreak in Barnstable County, Massachusetts found that 74% of individuals who were infected were fully vaccinated for COVID-19 and those individuals had on average more virus in their nose than the unvaccinated individuals who were also infected.   (*Id.* ¶ 42.)  That study reported zero cases of infection among those that previously had COVID-19. (*Id.*) Thereafter, the Director of the CDC, Rochelle Walensky, admitted on television that "**what [the COVID-19 vaccines] can't do anymore is prevent transmission**."  (ER_201-202 ¶ 43.)

**COVID-19 Vaccinations Present a Greater Risk to People with Natural Immunity**

There are risks to receiving COVID-19 vaccines. (ER_203 ¶ 47.) For example, a recent study at Mass General Brigham which assessed anaphylaxis in a clinical setting after the administration of COVID-19 vaccines, found "severe reactions consistent with anaphylaxis occurred at a rate of **2.47 per 10,000 vaccinations**." (*Id.* ¶ 48.) This is for a serious, potentially life-threatening, adverse event that occurs almost immediately after vaccination. (*Id.*) Additionally, on June 23, 2021, the CDC reported the alarming numbers of reported myocarditis and pericarditis cases occurring after COVID-19 vaccination. (ER_204 ¶ 49.) The long-term effects of myocarditis are not fully understood but can be very serious. (*Id.*) Cases of thrombocytopenia have also occurred after COVID-19 vaccination, as well as serious and sometimes fatal blood clots. (*Id.*) These and numerous other serious adverse events are being recognized but the true rate of these serious adverse events is most certainly underreported. (*Id.*) Studies show that naturally immune individuals have significantly higher rates of these and other adverse reactions when receiving the COVID-19 vaccine. (ER_203 ¶ 46.)

Thus, even if the risks from the COVID-19 vaccines are truly small, those risks are greater for people with natural immunity. (ER_204 ¶ 50.) Under such circumstances, there is no reason to expose someone to *any* risk when they are already immune to COVID-19. (*Id.*)

**The UC Mandate Prohibits Naturally Immune Individuals from Returning to Campus**

On July 15, 2021, the UC system released its final COVID-19 Vaccination Program Policy (*i.e.*, UC Mandate). (ER_205 ¶ 51.) Since that time, the UC system has systemically enforced the policy. (*Id.*) The stated purpose of the policy "is to facilitate protection of the health and safety of the University community" by requiring the UC community to "be fully vaccinated against COVID-19 before physically accessing the University's Locations and Programs." (*Id.*)

The Frequently Asked Questions section of the UC Mandate specifically addresses naturally immune individuals. (ER_205-206 ¶ 52.) In relevant part, it states that someone who has previously been infected "may be eligible for a temporary Medical Exemption (and, therefore, a temporary Exception), for up to 90 days after your diagnosis and certain treatments." (*Id.*) However, it makes clear that "individuals who have been diagnosed with COVID-19 or had an antibody test are not permanently exempt from vaccination." (*Id.*) Therefore, a naturally immune individual like Appellant, who is not vaccinated, is not allowed to return to a UC campus, but vaccinated individuals with a weaker level of immunity can return to those campuses. (ER_208 ¶ 61.)

The temporary 90-day exemption is not grounded in science. (ER_206 ¶ 53.) UC has not shown any data to prove that natural immunity on day 89

following diagnosis differs from that immunity on day 91 following diagnosis. (*Id.*)  Appellant recovered from COVID-19 over one year ago and, therefore, is not entitled to this temporary naturally immune exemption even though his immunity is superior to an individual who was vaccinated and is allowed on campus. (ER_201 ¶ 40.)  Appellant merely wants the same rights and privileges afforded to others who are deemed immune through vaccination.  (ER_206 ¶ 54.)  Instead, he is being required, under threat of exclusion from UC, to violate his bodily integrity with an injection of a product that presents risks but no benefit to him or to others at UC.  (*Id.*)

**Relevant Proceedings Below**

In order to challenge the UC Mandate, Appellant filed his instant complaint on August 18, 2021.  (ER_187-215.)  In it, Appellant asserted two counts for: (1) declaratory and injunctive relief based on a violation of the equal protection clause of the Fourteenth Amendment; and (2) declaratory and injunctive relief based on a violation of the substantive due process rights guaranteed by the Fourteenth Amendment.  (ER_209-214 ¶¶ 63-87.)  Thereafter, on August 23, 2021, Appellant filed a motion for preliminary injunction, which the District Court denied in a minute order entered on September 29, 2021, which the court subsequently

amended on October 5, 2021.[1] ("**Preliminary Injunction Order**"). (ER_144-167.) While that motion was pending, Appellant agreed with Appellee to dismiss the Regents of the University of California as a defendant, and therefore, the only defendant to file an answer was Appellee, Michael V. Drake. (ER_168-186.)

After filing his answer, Appellee filed a motion for judgment on the pleadings ("**Motion**"), wherein he requested that the District Court dismiss the action in its entirety. In filing the Motion, Appellee asked the District Court to judicially notice 117 pages of documents appearing on various websites, which he attached as Exhibits 1 through 9. (ER_027-143.) The first exhibit was the Vaccine Policy itself. (ER_008-009.) Exhibits 2 through 8 were publications appearing on government websites. (ER_009.) The final exhibit, number 9, was a publication on the Infectious Diseases Society of America website. (ER_010.)

**District Court Grants Motion for Judgment on the Pleadings**

On December 9, 2021, the District Court entered an "Order Regarding Motion for Judgment on the Pleadings" in which it granted Appellee's Motion. (ER_004-018.) After providing a short description of some of the relevant facts, the District Court addressed Appellee's requests for judicial notice. (ER_008.) Regarding the Vaccine Policy, the District Court agreed with Appellant that it

---

[1] On October 5, 2021, the Court only amended the title of the September 29, 2021 minute order.

could take judicial notice of the existence of the Vaccine Policy, but not any disputed facts stated within the Vaccine Policy. (ER_008-009.) As to Exhibits 2 through 8, the government website publications, the District Court again agreed with Appellant that because those documents were not referenced in the Complaint, and because they contained disputed facts, it could only take judicial notice of the existence of those documents, but not of the contents of those documents. (ER_009-010.) The Court declined to take judicial notice of the final exhibit, No. 9, because it did not appear on any government website nor was it referenced in the Complaint. (ER_010.)

The District Court acknowledged that a motion for judgment on the pleadings was subject to the same standard as a motion to dismiss. (ER_007.) The Court then analyzed what standard of review should be applied, concluding that unless a fundamental due process right was implicated by the UC Mandate, it would apply only a rational basis review. (ER_011.) Nevertheless, the Court found that, because other courts had not recognized a fundamental right to refuse vaccination in other contexts, the District Court would not recognize one here. (ER_011-014.) It then rejected Appellant's argument that in order to evaluate whether a fundamental right was implicated, the Court needed to balance the rights of the individual against the interests of the state. (ER_014-015.) The District Court then held that the UC Mandate satisfied the rational basis review because

protecting the safety of the UC community was a legitimate purpose, and the Vaccine Policy was rationally related to furthering that purpose. (ER_015-017.)

## SUMMARY OF THE ARGUMENT

Appellant appeals the Judgment on the Pleadings Order because the District Court erred in several ways when it granted Appellee's Motion and dismissed the Complaint.

First, in reaching its conclusion, the District Court improperly failed to comply with the limitations placed on a Rule 12(c) motion for judgment on the pleadings. It did not accept as true the allegations made in the Complaint. For example, it accepted the assertion in the Vaccine Policy that vaccinating the campus community was necessary to prevent the spread of COVID-19, even though the Complaint strongly refuted that claim through citations to numerous scientific studies. As this example indicates, the District Court also improperly took judicial notice of disputed facts contained in both the contents of the Vaccine Policy and/or the contents of the government website publications cited by Appellant. Moreover, because the District Court thought it needed to take judicial notice of nearly 100 pages of external information, and then use that information in its decision, the Court fundamentally failed to comply with the purpose behind the limitations placed on a Rule 12(c) motion.

In addition to these procedural errors, the District Court also improperly substantively analyzed the legal issues presented by the Complaint. Most disturbingly, the District Court employed a categorical approach to determining whether forcing Appellant to be vaccinated violated his fundamental due process right to bodily integrity, right to make medical decisions, and right to refuse medical treatment. Instead, the District Court should have followed numerous other courts' leads and evaluated whether the UC Mandate violated Appellant's fundamental rights by balancing the Appellant's rights against UC's interests. If the District Court had performed this balancing test, and accepted the allegations in the Complaint as true, it would have determined that requiring a vaccination does implicate Appellant's right to bodily integrity, right to make medical decisions, and right to refuse medical treatment. It would have also concluded that, because Appellant has natural immunity to the COVID-19 virus, UC did not have any interest in keeping him off campus while allowing vaccinated individuals on campus in that he posed less of a risk of transmitting the virus than did the vaccinated individuals. Therefore, the District Court should have concluded that the UC Mandate violated Appellant's fundamental due process rights and should have applied strict scrutiny to deny the Motion.

Furthermore, if the District Court had accepted as true the facts in the Complaint, it would have concluded that the UC Mandate does not even satisfy the

rational basis standard. Because the Complaint alleges that naturally immune individuals like Appellant are less likely to transmit COVID-19, UC's decision to exclude such people from Campus is not rationally related to its goal of stopping the spread of the virus on campus.

These errors provide sufficient cause for this Court to grant the instant appeal and reverse the District Court's grant of the motion for judgment on the pleadings.

## STANDARD OF REVIEW

This Court reviews de novo an order on a Rule 12(c) motion for judgment on the pleadings. *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1068 (9th Cir. 2020). The Court accepts all factual allegations in the complaint as true and construes them in the light most favorable to the non-moving party. *Id.* As under a Rule 12(b)(6) motion to dismiss, a Rule 12(c) motion for judgment on the pleadings is properly granted only when, "taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Id.*

## ARGUMENT

## I. THE JUDGMENT ON THE PLEADINGS ORDER SHOULD BE REVERSED BECAUSE THE DISTRICT COURT LOOKED WELL BEYOND THE CONFINES OF RULE 12(C)

### A. Standard on a Rule 12(c) Motion

"The standard on a motion for judgment on the pleadings is the same as that applied on a motion pursuant to *Fed. R. Civ. P.* 12(b)(6)." *In re Live Concert*

*Antitrust Litig.*, 247 F.R.D. 98, 150 (C.D. Cal. 2007) (internal quotations omitted). The Complaint must only set "forth a cognizable legal theory" and therefore the Complaint "will survive a motion for judgment on the pleadings where it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Prairie Farms, L.L.C. v. Town of Colorado City*, No. CV-16-08232-PCT-DLR, 2017 WL 10237887, at *1 (D. Ariz. Apr. 10, 2017) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Creative Care, Inc. v. Connecticut Gen. Life Ins. Co.*, 2019 WL 6354366, at *1 (C.D. Cal. Aug. 8, 2019).

Likewise, "[o]n a Rule 12(c) motion, 'the allegations of the non-moving party [here Appellant] must be accepted as true[.]'" *Upper Deck Co. v. Panini Am., Inc.*, No. 20CV185-GPC(KSC), 2021 WL 1388630, at *2 (S.D. Cal. Apr. 13, 2021) (quoting *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989)). "As with Rule 12(b)(6) motions, judgment on the pleadings is improper if the district court must go beyond the pleadings to resolve an issue." *Peoples v. Machuca*, No. 19-CV-05468-YGR (PR), 2021 WL 1845533, at *1 (N.D. Cal. Mar. 19, 2021); *Upper Deck Co.*, 2021 WL 1388630 at *2 ("A court must not consider matters beyond the pleadings as such a proceeding must be treated as a motion for summary judgment."). "In reviewing the sufficiency of a

complaint, '[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (reversing grant of motion on the pleadings) (*quoting Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

**B. The District Court Improperly Failed to Accept as True the Allegations in the Complaint**

As detailed above, the Complaint in this action went into great detail regarding both how naturally immune individuals are less likely to transmit COVID-19, and how the latest science shows that the COVID-19 vaccines do not prevent such transmission. For example, the Complaint describes how "there has never been a single documented case of a naturally immune individual becoming re-infected with and transmitting the [COVID-19] virus to anyone." (ER_195 ¶ 23.) It then provides scientific evidence to established that fact. (ER_196-197 ¶¶ 29-31.) It also describes how multiple studies have found that vaccine induced immunity, in contrast, does not protect against re-infection and transmission of the COVID-19 virus nearly as well as natural immunity, (ER_197-202 ¶¶ 32-44), going so far as to quote the CDC Director who "admitted that 'what [the COVID-19 vaccines] can't do anymore is prevent transmission.'" (ER_201-202 ¶ 43.)

When describing the factual background of the case, the District Court briefly referenced these conclusions. (ER_005-006.) Nevertheless, when the District Court evaluated whether a vaccination implicated a fundamental right, it

completely ignored the extensive allegations in the Complaint regarding how natural immunity provides greater protection against transmission than vaccine induced immunity. Instead, it simply accepted Appellee's contention that vaccination was necessary to prevent re-infection and transmission of the COVID-19 virus. (ER_113-114.) For example, the District Court stated that Appellant was "seeking to refuse a **vaccine that the University is requiring to protect the broader campus community**." (ER_114 (emphasis added).) Likewise, when it categorically held that vaccination can never trigger the Constitutional protection provided by the fundamental right to bodily integrity, the District Court stated that "vaccination efforts go beyond treating the individual and provide a public health benefit to the larger community." (ER_013.) As described in the next section, the District Court again ignored the allegations in the Complaint when it accepted as true statements in external documents supplied by Appellees.

By refusing to accept as true the allegations in the Complaint regarding how vaccination was not necessary to protect the campus community from naturally immune individuals, the District Court applied the wrong standard. This error caused the court to reach the incorrect conclusion, which necessitates reversal of the Judgment on the Pleadings Order.

### C. The District Court's Application of the Judicial Notice Doctrine Abused the Rule 12(c) Standard

Beyond not accepting the allegations in the Complaint as true, the District Court also improperly relied on extrinsic evidence that supported its preferred conclusion that the UC Mandate was rationally related to stemming the spread of the virus. In making its motion, Appellee asked the District Court to take judicial notice of over 100 pages of extrinsic documents, most of which were never referenced in the Complaint and all of which contained highly disputed facts. "Because [Appellee was] moving for judgment on the pleadings pursuant to *Fed. R. Civ. P.* 12(c)," the District Court needed to "avoid reliance upon [such] extrinsic evidence[.]" *Qwest Communications Corp. v. City of Berkely*, 208 F.R.D. 288 (2002) at 296 n.9. Nevertheless, even though the District Court claimed that it did not take into consideration the contents of those documents, as will be shown, it did rely on their contents and therefore, its decision went beyond the narrow basis for a Rule 12(c) motion.

### 1. The District Court's reliance on the government websites was improper

The District Court attempted to have its cake and eat it too when it declared that it would take judicial notice of the Vaccine Policy, but not any disputed facts therein, and the existence of six different publications on the FDA and CDC websites, but none of the facts in those publications. (ER_008-009.) However, in its final ruling, the Court went well beyond these self-identified limitations. When

the District Court later concluded that the Vaccine Policy met rational basis review, it asked "whether the University could have had a legitimate reason for acting as it did." (ER_017.) In answering that question the District Court stated:

> the University considered scientific literature and evidence before deciding to require vaccination. See Policy at 16-17. Additionally, the Vaccine Policy cites to government publications suggesting that a positive antibody test is insufficient to establish immunity. See Policy at 18. Presented with that evidence, it would be reasonable for the University to conclude that a broad vaccine requirement would be necessary even if the allegations in the complaint were true.

(*Id.*; *see also* ER_006 (accepting the same facts).) Nevertheless, in reaching this conclusion that the University had support for its decision, the District Court had to either rely on the contents of the cited government websites/scientific literature, or on the descriptions of those documents that appear in the Vaccine Policy, which all contained disputed facts regarding the efficacy and identifiability of natural immunity. (ER_190 ¶ 6, ER_193 ¶ 18, ER_209 ¶ 66 (alleging that there is no doubt that Appellant had COVID and recovered).) *See also Akahoshi v. Bank of Am., N.A.*, No. CV 15-818 DSF (GJSx), 2015 U.S. Dist. LEXIS 102835, at *3 (C.D. Cal. Aug. 5, 2015) ("[I]t would be improper for the Court to judicially notice reasonably disputed facts, even if those facts are stated within publicly recorded documents." (citing *Lee v City of Los Angeles*, 250 F.3d 688-89 (9th Cir. 2001)); *Pinterest Inc. v. Pintrips Inc.*, 15 F. Supp. 3d 992, 997 (N.D. Cal. 2014) ("[W]hile

23

'undisputed matters of public record' are judicially noticeable, a court may not take notice of disputed facts in public records." (citing *Lee*, 250 F.3d at 689)).

By relying on the contents of such documents, even after the District Court acknowledged that it could not take judicial notice of such contents (ER_010), the District Court went beyond the bounds of a Rule 12(c) motion and therefore erred in granting the motion on those grounds. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018) (holding that even if a document could be reviewed under judicial notice, doing so is improper where the other party disputes the facts asserted in that document). If instead, the District Court had actually accepted as true the statements in the Complaint, and disregarded the contents of the exhibits, as more fully discussed below in Section III, it could not have found that UC had a rational basis for the decision to treat individuals with vaccine induced immunity differently than individuals with natural immunity. As such, the District Court's error directly affected its ultimate conclusion and warrants reversal of the entire decision.

### 2. The fact that the District Court needed to take into consideration so many outside documents should have taken the motion outside the bounds of Rule 12(c)

Even if the District Court could have taken judicial notice of such documents, in similar situations where movants have asked a court to rely on copious outside documents, courts have found reliance on extensive outside

documents improper, and not how a Rule 12(c) motion is intended to be used. For example, in *Qwest Communications Corp.*, the moving party submitted with its motion for judgment on the pleadings numerous briefs and court documents. 208 F.R.D. at 296 n.9. Even though the Court could have taken judicial notice of those documents, it declined to do so because that would push the motion beyond the bounds of one for judgment on the pleadings and into a motion for summary judgment. *Id.*; *see also Jacobson v. AEG Capital Corp.,* 50 F.3d 1493, 1496 (9th Cir. 1995) ("[i]n considering AEG's motions to dismiss, the district court took judicial notice of the extensive records and transcripts from the prior bankruptcy proceedings[,]" therefore the court should have reviewed it as a motion for summary judgment not one for judgment on the pleadings); *Hal Roach Studios, Inc. v Richard Feiner And Company, Inc.*, 896 F.2d 1542 at 1550 (reversing a grant of judgment on the pleadings where the district court relied on documents outside the pleadings); *Stillman v. Column 5 Consulting, L.L.C.*, No. 3:14-CV-8207-HRH, 2016 WL 3254211, at *2 (D. Ariz. June 14, 2016) (finding that a request to review other documents previously filed on the Court's docket pushed the motion outside the bounds of Rule 12(c)).

Therefore, as the court held in *Qwest*, the extrinsic documents relied on by the Court pushed the motion beyond the bounds of a motion for judgment on the pleadings, and as such, the District Court should not have even acknowledged

those documents. Instead, rather than simply accepting the documents Appellee presented, Appellant should have been given the opportunity to take discovery and present his claim for summary judgment on even grounds with Appellee.

## II. THE JUDGMENT ON THE PLEADINGS ORDER SHOULD BE REVERSED BECAUSE THE DISTRICT COURT SHOULD HAVE APPLIED STRICT SCRUTINY TO INVALIDATE THE UC MANDATE

The Complaint asserts that by excluding naturally immune individuals (like Appellant) from its campuses under the UC Mandate, Appellee violated Appellant's substantive due process rights and equal protection rights. (ER_209-214 ¶¶ 63-87.) In evaluating these constitutional claims, the District Court had to first determine the level of scrutiny to apply to those claims. To make that determination, the District Court "look[ed] to whether [Appellant] identified a fundamental right that is violated by the Vaccine Policy." (ER_011.) If a fundamental right is violated, then the District Court agreed that it should strictly scrutinize UC's decision. (*Id.* ("[t]he Due Process Clause 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997))). *See also Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1111 (E.D. Cal. 2012) (holding that where an equal protection claim affected the plaintiff's right to bodily integrity, which was a fundamental right, the government action needed to be reviewed on strict scrutiny grounds).

Nevertheless, in evaluating whether the UC Mandate violated one of Appellant's fundamental rights, the District Court erred by categorically holding that no individual ever has the fundamental right to refuse any medical procedure so long as the procedure is referred to as a vaccination. This categorical approach ignored over a century of due process analysis. Instead, the Court should have acknowledged that any required injection of a foreign substance into a subject's body implicates that individual's due process right to bodily integrity, right to control medical treatment, and right to refuse medical treatment. Then, in order to determine whether that injection established a fundamental due process right protected by the Constitution, the District Court should have employed the balancing test utilized in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), and as discussed below numerous other fundamental due process right cases thereafter, where the individual's right to bodily integrity and medical decision making is balanced against the state's need to invade that right.

Typically, when other courts have employed this balancing test in vaccination cases, they have determined that the state's need to protect other citizens from the spread of communicable disease trumps the individual's due process rights with regard to vaccinations. However, if the District Court had accepted the allegations in the Complaint as true, and employed the balancing approach, it would have acknowledged that, because naturally immune individuals

are less likely to transmit the COVID-19 virus than vaccinated individuals, the balancing needs to favor the naturally immune individual because UC could not have claimed it needed to exclude naturally immune individuals in the UC Mandate to protect against the spread of the virus. As such, because the Appellant's right to bodily integrity, right to control medical treatment, and right to refuse medical treatment outweighed UC's need for him to be vaccinated, the UC Mandate should have been evaluated under the strict scrutiny analysis, an evaluation the mandate cannot satisfy.

### A. Requiring A Vaccination Is An Invasion Of Appellant's Constitutionally Protected Right To Bodily Integrity, Right To Control Medical Treatment, And Right To Refuse Medical Treatment

When the District Court issued its Preliminary Injunction Order in the instant action, it acknowledged that *Jacobson v. Commonwealth of Massachusetts* "does not mean that a court must find any vaccination effort to be constitutional. As the Supreme Court recently emphasized, 'even in a pandemic, the Constitution cannot be put away and forgotten.'" (ER_150 (quoting *R.C. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020)).) However, that acknowledgment was absent from the District Court's analysis in the Judgment on the Pleadings Order. Rather, the District Court took an extremely narrow approach to establishing what constitutes a fundamental right and held that whether a fundamental right exists depends on how other courts have categorized the specific medical procedure.

(ER_014.) It then noted that "[t]he courts to consider the issue have applied rational basis review because they consistently found that vaccination does not implicate a fundamental right." (*Id.*) From this, the District Court categorically held that a plaintiff's fundamental due process rights do not extend to encompass vaccination. (*Id.*) Thus, so long as a medical procedure can be described as a vaccination, regardless of what it actually does, according to the District Court it cannot implicate a patient's fundamental rights and the state is free to force any individual to undergo that medical procedure.

However, the categorical approach employed by the District Court bears little resemblance to how courts have previously analyzed whether a procedure implicates fundamental due process rights, including the right to bodily integrity, right to control medical treatment, or right to refuse medical treatment. *Jacobson* did not simply rule that an individual can never have a fundamental right to refuse vaccination. Instead, in *Jacobson,* the Supreme Court acknowledged "the inherent right of every freeman to care for his own body and health in such way as to him seems best[.]" 197 U.S. at 26. Most courts have recognized that the rights identified here in *Jacobson* are the individual's fundamental rights to bodily integrity and to refuse unwanted medical treatment. *Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278 (1990) (citing *Jacobson* for the proposition that "[t]he principle that a competent person has a constitutionally

protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions"); *Guertin v. State*, 912 F.3d 907, 920 (6th Cir. 2019) (citing *Jacobson* among others when identifying the right to bodily integrity); *Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 313 (D. Mass. 1999) (recognizing *Jacobson* as part of long line of cases recognizing a right to bodily integrity).

Indeed, there can be little doubt that by requiring the injection of a vaccination, Appellee is at least implicating Appellant's fundamental right to bodily integrity, right to control medical treatment, and right to refuse medical treatment. Since *Jacobson*, there is significant caselaw that leads to the conclusion that an injection of any medication, including a vaccine, in and of itself, is a violation of an individual's right to bodily integrity. The Supreme Court has acknowledged in the context of the government drawing blood from a criminal suspect that "'[w]e have never retreated ... from our recognition that **any** compelled intrusion into the human body implicates significant, constitutionally protected ... interests.'" *Guertin*, 912 F.3d at 919 (*quoting Missouri v. McNeely*, 569 U.S. 141, 159 (2013)) (emphasis and ellipses in original). Likewise, the Supreme Court has unequivocally stated that a "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]" *Washington v. Harper*, 494 U.S. 210, 229 (1990).

Beyond just the Supreme Court, courts in this Circuit have long recognized the "**fundamental rights to determine one's own medical treatment**, to refuse unwanted medical treatment, and a fundamental liberty interest in medical autonomy." *Magney v. County of Humboldt*, No. 17-CV-02389-HSG, 2018 WL 6460506, at *4 (N.D. Cal. Dec. 10, 2018) (internal quotations omitted, emphasis added); *Saulsberry v. Maricopa Cty.*, 151 F. Supp. 2d 1109, 1118 (D. Ariz. 2001) ("A competent person has a constitutionally protected liberty interest to refuse unwanted medical treatment."). In fact, the caselaw is clear that the right to bodily integrity is implicated "**regardless of the manner in which the government intrudes upon an individual's body.**" *Guertin*, 912 F.3d at 919 (emphasis added).

This broad reading is consistent with the common law baseline from which this right developed; that is to say that "even the touching of one person by another without consent and without legal justification was a battery." *Cruzan*, 497 U.S. at 278; *Snyder v. Robinson*, No. 2:21-cv-00328-BLW, 2021 US Dist LEXIS 232116, at *17 (D. Idaho Dec. 1, 2021) (same). Thus, these rights have been acknowledged with regard to a variety of medical procedures. *E.g., Guertin*, 912 F.3d at 919 (emphasis added) (holding that plaintiffs had alleged a violation of the constitutional right to bodily integrity with regard to the Flint, Michigan water contamination); *see also Galvan v. Duffie*, 807 F. App'x 696, 697 (9th Cir. 2020) (citing *Cruzan* finding that the defendant, a prison officer, was not entitled to

qualified immunity because the plaintiff prisoner had a constitutionally protected liberty interest in refusing the unwanted medical procedure of having his tooth removed); *In re Cincinnati Radiation Litig.,* 874 F. Supp. 796, 813 (S.D. Ohio 1995) (holding that terminally ill plaintiffs who were exposed to radiation treatment have stated a claim for substantive due process finding that "when an individual's bodily integrity is at stake, a determination that the state has accorded adequate procedural protection should not be made lightly").

This right includes recognizing that forced injection of any medication does implicate the right to bodily integrity, right to control medical treatment, and right to refuse medical treatment. *E.g., Snyder v. Robinson*, No. 2:21-cv-00328-BLW, 2021 US Dist LEXIS 232116, at *17 (D. Idaho Dec. 1, 2021) (holding that forcible injection of medication violated the due process rights to bodily integrity, informed consent, and to refuse medical treatment); *Haas v. County of El Dorado*, No. 2:12-CV-00265-MCE, 2012 WL 1414115, at *10-11 (E.D. Cal. Apr. 23, 2012) (finding that plaintiff established a due process violation when he was administered a tranquilizer and then forced to go to the hospital). *see also Snow v. Corizon Healthcare*, 842 Fed. Appx. 135, 136 (9th Cir. 2021) (holing that it was possible a prisoner could make a substantive due process claim where he was not adequately informed of the side effects of his medication). If the forcible injection of a medication is sufficient to implicate a person's fundamental rights, then the forced

injection of a vaccine should implicate the same rights, especially given the potentially debilitating adverse reactions of the COVID-19 vaccines discussed in detail in the Complaint. (ER_202-204 ¶¶ 46-50.)

### B. Whether The Intrusion Into An Individual's Bodily Integrity Implicates A Fundamental Right Can Only Be Determined By Balancing The State's Needs Against The Individual's Rights

Just because a medical procedure, like vaccination, implicates an individual's right to bodily integrity, and the related rights to make medical decisions and to refuse unwanted medical procedures, does not mean that the individual automatically has a fundamental right to refuse that medical procedure. To make that determination, a court must balance the intrusion on the individuals' liberty interests against the state's objectives, how that balance tips then determines whether there is a fundamental right. *Saulsberry*, 151 F. Supp. 2d at 1118 ("whether a person's constitutionally protected liberty interest in refusing unwanted medical treatment has been violated 'must be determined by balancing his liberty interests against the relevant state interests.'" (quoting *Cruzan*, 497 U.S. at 262 (internal quotations omitted)). This is clear from the Sixth Circuit's recent statement that "the central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body." *Guertin*, 912 F.3d at 919 (emphasis added).

In *Jacobson*, the Supreme Court used this balancing approach; after it recognized the individual's right to bodily integrity, it acknowledged that the state's "police power … must be held to embrace … such reasonable regulations … as will protect the public health." 197 U.S. at 25-26, 29; *Heinrich*, 62 F. Supp. 2d at 313 ("The Supreme Court balances invasions of an individual's interest in bodily integrity against the state's interests in pursuing its invasive conduct.").[2] In preforming the balance, the Supreme Court found in *Jacobson* that because vaccination "prevent[ed] the spread of smallpox" during an epidemic, requiring vaccination was a reasonable means to protect public health, which outweighed the individual's liberty interest. 197 U.S. at 26; *see also id*. at 29, 30, 32, 34, 36 (relying on the ability of vaccination to prevent the spread of smallpox); *Cruzan*, 497 U.S. at 278 (describing *Jacobson* as where "the Court balanced an individual's liberty interest in declining an unwanted smallpox vaccine against the State's interest in preventing disease"); *Williams v. Santiago*, No. 116CV01065MJSPC, 2016 WL 6494268, at *3 (E.D. Cal. Nov. 1, 2016) (describing *Jacobson* the same way).

---

[2] This Court employed a similar balancing of state rights vs. individual rights to bodily integrity in *Plumeau v. School Dist. No. 40 County of Yamhill*, 130 F.3d 432 (9th Cir. 1997), when it held that a student's right to bodily integrity included the right to be free from sexual abuse by school employees. *Id.* at 438; *see also Williams v. DeLeon*, No. 115CV00543SKOPC, 2018 WL 4352902, at *9 (E.D. Cal. Sept. 11, 2018) (directly equating the analysis employed in *Plumeau* with the balancing test employed in *Cruzan* and *Jacobson* to hold that prison's interest in a blood test outweighed the prisoner's interest in bodily integrity).

Likewise, in the context of the right to refuse medical treatment, multiple courts in this circuit have cited *Cruzan* and *Jacobson* to conclude that "the Court must **balance** Plaintiff's 'liberty interests against the relevant state interests.'" *Merriman v. Lizarraga*, No. 217CV1701MCEKJNP, 2017 WL 4340041, at *4 (E.D. Cal. Sept. 29, 2017) (quoting *Cruzan*, 497 U.S. at 279). Those courts weighed the same factors at issue in *Jacobson*, *i.e.*, whether the medical procedure at issue was necessary to protect others. Those courts then concluded that "[s]o long as plaintiff can show that he posed no risk to himself or others when he refused to accept treatment, he can make out a cognizable claim" for violation of his fundamental due process right to refuse medical treatment. *Id*., at *4 (discussing how a court should employ the balancing test referenced in *Cruzan* and *Jacobson* in order to determine whether a right to refuse medical treatment was implicated by the state's actions); *Jones v. Magallon*, No. 115CV01897DADMJSPC, 2016 WL 1162669, at *3 (E.D. Cal. Mar. 24, 2016) (same).

For instance, in *Haas v. County of El Dorado*, the plaintiff declined medical assistance, but the county paramedics used force to make him go to the hospital. 2012 WL 1414115 at *1. The plaintiff alleged a violation of his substantive due process right to refuse medical treatment. *Id.* at *10. In analyzing whether he had a substantive due process right, the court balanced his right to refuse treatment

against the county's interests (*e.g.*, ensuring he did not injure anyone else by driving himself to the hospital). *Id.* It then denied the motion to dismiss because the plaintiff had a "clearly established constitutional right to refuse medical treatment without any legitimate public interest" counterbalancing that right. *Id.* at *11.

Outside this circuit, courts have long employed the *Jacobson* balancing test when evaluating constitutional claims regarding liberty rights such as the right to bodily integrity or to make medical decisions. For example, in *Matter of Fosmire v. Nicoleau*, 75 N.Y.2d 218 (1990), the New York Court of Appeals reviewed whether an individual had the right to refuse a blood transfusion under the state and federal constitutional rights to determine the course of her own medical treatment. *Id.* at 225. The court acknowledged that "an identified State interest which conflicts with a patient's choice will not always prevail. There are many cases where the State's concern is not sufficient to override the individual's right to determine the course of medical treatment as a patient." *Id.* at 226 (citing *Jacobson*). "The threshold inquiry is whether there is an identifiable State interest in intervening in the patient's medical choice. If there is, the inquiry must focus on whether the State's interest is sufficiently substantial to outweigh the individual's right." *Id.* at 227. Ultimately, that court concluded that the state's interests did not outweigh those of the individual's right to refuse treatment. *Id.*

Similarly, in a concurrence/dissent in *Liberian Community Assn. of Connecticut v. Lamont*, 970 F.3d 174 (2d Cir. 2020), Judge Chin on the Second Circuit recently provided a good example of the proper use of the *Jacobson* balancing approach.[3]   In that case, upon the plaintiffs' return from Liberia, Connecticut health officials forcibly quarantined them due to a concern that they could have contracted Ebola while in Liberia.  *Id.* at 194  (Chin, J., concurring in part and dissenting in part).

Judge Chin started his analysis by describing the balancing test used in *Jacobson*: "More than a century ago, the Supreme Court recognized the need to balance the government's interest in protecting the public health and safety by controlling the spread of disease against the rights of individuals to be free from unreasonable restraint."  *Id.*   He then quoted from *Jacobson* that: "'if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.'"  *Id.* (quoting *Jacobson*, 197 U.S. at 31).   Based on this balancing, Judge Chin

---

[3] The majority opinion articulated in *Liberian Community Assn. of Connecticut v. Lamont*, 970 F.3d 174 (2d Cir. 2020), did not question Judge Chin's balancing test directly, rather it found that the due process standards associated with quarantine were "simply not clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," and therefore dismissed the matter on qualified immunity grounds.  *Id.* at 191 (internal quotations omitted).

concluded that the quarantine had violated plaintiffs' substantive due process rights. *Id.* at 197. He acknowledged that "[w]hile intrusions on personal liberties will of course be necessary to safeguard public health and safety, they must be based on scientific and not political considerations." *Id.* at 194. In that case, the complaint alleged that: "The overwhelming consensus in the scientific community at the time was, and remains, that asymptomatic individuals cannot transmit Ebola and do not require quarantine." *Id.* at 197. As a result, Judge Chin wrote that the state officials "infringed on plaintiffs' fundamental right to liberty, without justification or individualized consideration" and therefore he applied strict scrutiny to their claims. *Id.* at 198.

### C. The District Court Incorrectly Used a Categorical Method, Rather Than The Jacobson Balancing Test, For Determining Whether A Fundamental Right Was Violated By The UC Mandate

In the instant matter, in the Judgment on the Pleadings Order, the District Court misconstrued Appellant's arguments regarding the *Jacobson* balancing test and effectively denied that such a balancing test is ever even appropriate. The District Court appears to have incorrectly believed that the *Jacobson* balancing test does not even exist. (ER_014-015.) This may have been because it wrongly assumed that Appellant was advocating for the balancing test to substitute for determining whether to apply strict scrutiny, rather than the balancing test being an

analytical framework by which to determine whether a fundamental right exists in the first place. (*Id.*)

The District Court's confusion can be seen when it criticized some of the cases Appellant cited by noting that those cases "do not discuss tiers of scrutiny at all." (ER_015.) Those cases (*Guertin* and *Heinrich*) employed the balancing test to evaluate whether a fundamental right exists. In *Guertin* the Sixth Circuit utilized the balancing test to determine whether the residents had a right to bodily integrity with regard to the state's failure to properly treat water in Flint, Michigan. 912 F.3d at 919. In *Heinrich*, the District of Massachusetts used the balancing test to determine whether a radiation experiment violated the patients' right to bodily integrity. 62 F. Supp. 2d at 314. In both instances, the courts were dealing with specific events, rather than government policies; therefore, after determining there was a violation of a fundamental right, the courts did not need to take the next step of evaluating which level of scrutiny to apply to the policy that violated the individual's right. Regardless, however, both cases show how the balancing test should be used to determine whether a government actor violated an individual's fundamental right.

Rather than use the balancing test, the District Court employed a simple categorical approach whereby it only asked whether another decision has recognized the fundamental right and, if not, then the Court assumed no right

existed. (ER_013-014.) Under such an approach, the District Court never analyzed the medical procedure at issue here (*i.e.*, a COVID-19 vaccination), therefore it never asked what the medical procedure did, what effect it would have, or what risks were involved, nor did it critically analyze what interest the state had in requiring the medical procedure. It assumed that if a medical procedure was classified a certain way, here a vaccination, then it could not implicate a fundamental right. This category based approach could lead to the absurd result that any medical procedure that could reasonably be termed a vaccination could never implicate a fundamental right. This would be true even where the procedure has none of the traditional hallmarks of vaccination that decisions like *Jacobson* used to hold that the state's interest outweighed the individual's rights (*e.g.,* the ability to prevent the spread of an infection, which is what the Complaint alleges the COVID-19 vaccination cannot do). *See Jacobson*, 197 U.S. at 33-34 (repeatedly referencing the smallpox vaccine's role in preventing the spread of the infection when justifying a state's need to mandate vaccination). (ER_212-213 ¶ 82 (alleging that the COVID019 vaccine does not prevent transmission).)

### D. If The District Court Had Employed the Balancing Test Here, it Would Have Established That Naturally Immune Individuals Have A Fundamental Right to Refuse Vaccination

In the cases the Court cited in the Judgment on the Pleadings Order where a plaintiff challenged the constitutionality of a vaccine mandate, the plaintiff failed

for one reason: when the individual's desire to not be injected with a vaccine was balanced against the state's interest in preventing the spread of a disease, the state's interest won and the court applied a standard akin to rational basis. *See, e.g.*, *Williams v. Brown*, No. 6:21-CV-01332-AA, 2021 WL 4894264, at *9 (D. Or. Oct. 19, 2021) (evaluating the individual's right against the state's need to curb the spread of COVID-19); *Harris v. Univ. of Massachusetts, Lowell*, 21-CV-11244-DJC, 2021 WL 3848012, at *6 (D. Mass. Aug. 27, 2021) (same); *Klaassen v. Trustees of Indiana Univ.*, No. 1:21-CV-238 DRL, 2021 WL 3073926, at *26 (N.D. Ind. July 18, 2021) (holding that to evaluate the students' claim that vaccination violated their right to bodily integrity "the court must balance their liberty against the relevant state interests in accord with the Constitution"), *reversed on other grounds* 24 F.4th 638 (7th Cir. 2022).

Nevertheless, the Complaint in this action presents a different balance from that presented in the prior vaccine cases cited by the District Court. Here, as the District Court acknowledged, Appellee's only tenable interest in enacting the UC Mandate was in "[s]temming the spread of COVID-19[.]" (ER_016 (quoting *Cuomo*, 141 S. Ct. at 67.) However, as discussed, the Complaint alleges in great detail how naturally immune individuals are far less likely to transmit the virus than are vaccinated individuals. (ER_201 ¶ 40.) Specifically it alleges that:

> Natural immunity confers an additional benefit over
> vaccine immunity. Natural immunity will prevent a virus

> from being able to replicate and shed in the naturally immune individual. In contrast, COVID-19 vaccines appear to reduce symptoms in some but still permit the vaccinees to become infected with and transmit the virus.

(*Id.*) If the District Court had accepted those facts as true, as it should have on a Rule 12(c) motion, then naturally immune individuals present less of a risk to spread COVID-19 to others in the UC community when compared to vaccinated individuals.

Therefore, by prohibiting naturally immune individuals from coming onto campus, Appellee was not acting to "to facilitate protection of the health and safety of the University community". (ER_006 (quoting UC Mandate policy).) Instead, at most, requiring Appellant to be vaccinated could be seen as a measure to protect his health, but assuming the truth of the facts alleged, it was not necessary to protect the health of the university community generally. For this reason, the UC Mandate, as applied to people who are already naturally immune to the vaccine, like Appellant, implicates only an individual's well-established rights to bodily integrity and medical choice, without any countervailing state interest. As such, because the balance tips towards Appellant, he had a fundamental due process right to refuse vaccination. Therefore, because the UC Mandate violated Appellant's fundamental due process rights, it must be strictly scrutinized. (ER_011 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).)

### E. The UC Mandate Cannot Survive Strict Scrutiny Analysis Based On The Facts Alleged In The Complaint

As the Supreme Court has explained, in applying strict scrutiny to any government policy implicating a fundamental right, the policy "must be narrowly tailored to promote a compelling Government interest." *U.S. v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id.*; *see also Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989).

As the District Court found, the government (here, Appellee) has a compelling interest in stemming the spread of the COVID-19 virus. (ER_016.) However, as discussed above, the UC Mandate permitting vaccinated individuals on campus, but refusing to permit naturally immune individuals on campus, does not promote that interest because vaccinated individuals are more likely to spread the virus than naturally immune individuals. (*E.g.,* ER_201 ¶ 40.) As such, the UC Mandate is not narrowly tailored because it does not exempt naturally immune individuals. (ER_201-202 ¶¶ 40-44, ER_210 ¶¶ 71-72.) The less restrictive alternative, obviously, is to permit individuals who can establish they possess natural immunity to return to campus. As such, the UC Mandate cannot satisfy strict scrutiny analysis and the District Court should have denied Appellee's motion for Judgment on the Pleadings.

**III.  THE JUDGMENT ON THE PLEADINGS ORDER SHOULD BE REVERSED BECAUSE EVEN UNDER THE RATIONAL BASIS STANDARD, THE DISTRICT COURT SHOULD HAVE HELD THAT THE ALLEGATIONS IN THE COMPLAINT STILL PRESENT A PLAUSIBLE CAUSE OF ACTION**

For the reasons stated above, the District Court should have applied the strict scrutiny standard to the UC Mandate.  Nevertheless, even applying the lower rational basis standard, the District Court should still have denied the motion for judgment on the pleadings.  The facts alleged in the Complaint are sufficient to establish that Appellee lacked a rational basis for precluding naturally immune individuals from entering campus because the Complaint clearly states that such individuals cannot transmit COVID-19 to anyone else.

### A. The Standard for Rational Basis Review on a Motion to Dismiss is Not "Toothless"

"In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Sacramento County Retired Employees Ass'n v. County of Sacramento*, No. CIV S-11-0355 KJM, 2012 WL 1082807, at *5 (E.D. Cal. Mar. 31, 2012) (internal quotations omitted).  (ER_153 (applying the same standard).)

Applying a rational basis review at the motion to dismiss stage "'poses unique challenges.'" *HSH, Inc. v. City of El Cajon*, 44 F. Supp. 3d 996, 1008 (S.D. Cal. 2014) (cited by Appellee below) (*quoting Immaculate Heart Cent. School v. New York State Pub. High School Athletic Ass'n*, 797 F. Supp. 2d 204, 211 (NDNY 2011) (denying motion to dismiss equal protection claim)). On a motion to dismiss, the "court should take as true all of the complaint's allegations and reasonable inferences that follow, but the plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Id.* Stated differently, "it is not the court's task on a motion to dismiss [or on judgment on the pleadings] to determine whether defendant's actions were rationally related to its legitimate interest; rather, the court must determine whether plaintiffs have stated a claim for violation of the federal" constitutional right based on the allegations in the Complaint. *Sacramento County Retired Employees Ass'n v. County of Sacramento*, No. CIV S-11-0355 KJM, 2012 WL 1082807, at *6 (E.D. Cal. Mar. 31, 2012).

In applying this standard, the court should not simply accept the government's proposed rational basis at face value, rather "the rational relationship must be real" between the government's objectives and the means chosen to reach that goal. *HSH, Inc.*, 44 F. Supp. 3d at 1008; *see also Williams v. Paramo*, 17CV2475-CAB (NLS), 2019 WL 354704, at *12 (S.D. Cal. Jan. 29, 2019)

(holding that based on the allegations in the complaint "that determination of a rational basis at the motion to dismiss stage is premature"), *report and recommendation rejected on other grounds,* 17CV2475-CAB-NLS, 2019 WL 1409855 (S.D. Cal. Mar. 28, 2019). In this way, "the rational basis test is not toothless" and even in the ordinary case "calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be attained." *Dragovich v. U.S. Dept. of the Treasury*, 848 F. Supp. 2d 1091, 1100 (N.D. Cal. 2012) (internal quotations omitted).

### B. The Available Facts Do Not Establish the UC Mandate's Rational Relationship to the University's Goals

Taking as true only the facts alleged in the Complaint, Appellant has plausibly alleged that there is no rational reason why UC should preclude naturally immune individuals from campus. Even if the District Court could have considered the contents of the various documents attached to Appellee's papers, which it should not have done, those documents do not provide a rational reason to exclude naturally immune individuals from the UC.

As the District Court found, the purpose of the UC Mandate was to protect members of the UC community from COVID-19 by preventing the spread of the virus on campus. (ER_207 ¶ 57, ER_016.) The UC Mandate sought "to achieve this by ensuring that only people who theoretically have immunity to the virus return to campus." (ER_207 ¶ 57.) Nevertheless, the UC Mandate treated

differently two sets of immune individuals, those with natural immunity and those with vaccine-induced immunity.

As discussed above, the Complaint clearly alleges that naturally immune individuals have a lower risk of becoming re-infected and transmitting the virus than vaccinated individuals. (ER_201 ¶ 40.) It also establishes that natural immunity is lifelong. (ER_196 ¶ 27.) On the other hand, the immunity created by vaccination "typically wanes over time." (ER_198 ¶ 33.) The Complaint establishes these facts through citations to numerous sources, including studies in Israel and French Guiana, references to FDA and CDC published data, and quotations from leading researchers, including those in the UC system. (*Id.* ER_196-202 ¶¶ 29-44.) Nothing in the Complaint contradicts these conclusions. The Complaint also states that vaccinating people who are already immune presents increased risks, including that "naturally immune individuals have significantly higher rates of adverse reactions when receiving the COVID-19 vaccine." (ER_202-204 ¶¶ 46-50.)

Taken as true, these facts are insufficient at this stage for the Court to conclude that UC's decision to separate out naturally immune individuals and preclude them from campus was rational and related to the goal of preventing the spread of COVID-19. *Williams*, 2019 WL 354704 at *13 (holding that based on the allegations in the complaint "the Court cannot evaluate whether this connection

offered by Defendants was 'real.'"); *Stamas v. County of Madera*, No. CV F 09–0753 LJO SMS, 2010 WL 2556560, at *6 (E.D. Cal. June 21, 2010) ("A Rule 12(b)(6) motion is a challenge to the sufficiency of the pleadings and is not a factual challenge on the underlying merits.").  If naturally immune individuals have at least as good, if not better, immunity to COVID-19 compared to vaccinated individuals, then there is no legitimate governmental goal that would support treating those individuals differently from vaccinated individuals.

In tacit acknowledgment that the facts asserted in the Complaint cannot satisfy the rational basis test, Appellee asked the District Court to look beyond the Complaint at the 117 pages of additional documents Appellee submitted.  First, Appellee claimed that the Vaccination Program Policy document that established the UC Mandate provides a basis for its own policies.  However, nothing in the policy discusses why naturally immune individuals present a greater risk of transmitting the virus than vaccinated individuals, and as such nothing in the policy provides the necessary connection between the decision to exclude naturally immune people like Appellant from campus, and the goal of preventing the spread of COVID-19.  (ER_038 (stating the temporary exclusion policy without providing a justification for it).)

As the District Court noted, the Vaccine Policy does reference studies stating that a positive anti-body test is insufficient to establish immunity.  (ER_006

(quoting ER_038.)  However, beyond improperly accepting the contents of disputed statements in the Vaccine Policy (as discussed above), this issue should not have affected the Court's decision because whether there is a sufficient test is not what is at issue in this case.  Here, Plaintiff unquestionably had COVID-19, had a positive PCR test, and has now recovered, and therefore, the Complaint alleges that he has natural immunity.  (ER_193 ¶¶ 17-18.)  The District Court should have accepted this fact as true, rather than going beyond the Complaint to evaluate additional issues.

As to the other documents Appellee submitted and the District Court relied on, for the reasons stated above, these documents were all beyond the scope of a motion for judgment on the pleadings because they are inappropriate for judicial notice.  *See Khoja*, 899 F.3d at 1000 (holding that even if a document could be reviewed under judicial notice, doing so is improper where the other party disputes the facts asserted in that document).  Even if they could have been reviewed in connection with this Motion, nothing in those additional documents states that naturally immune individuals present a risk of becoming reinfected **and transmitting the virus to others**, let alone present a greater risk of transmission than individuals who are vaccinated.  (*E.g.*, ER_105-130 (stating only that the rate of reinfection following a SARS-CoV-2 infection is unknown, but never stating that naturally immune individuals present a risk of transmitting the virus)).  If

naturally immune individuals do not present a greater risk of transmitting the virus, then it was illogical to treat them differently than vaccinated individuals, especially where the CDC's own director admits that "'what [the vaccines] can't do anymore is prevent transmission.'" (ER_201-202 ¶ 43.) Thus, the external documents did not support the District Court's conclusion, and as such could not establish the rational basis for UC's exclusion of naturally immune individuals.

For these reasons, there were no facts in the record supporting the conclusion that naturally immune individuals are more likely to either contract or transmit COVID-19 when compared to vaccinated individuals. If anything, the record properly before the District Court established that naturally immune individuals present less of a risk in both categories. Based on these facts, the District Court was wrong when it concluded that UC "had a legitimate reason for acting as it did." (ER_017.) As a result, if the District Court had viewed the Complaint in the light most favorable to Appellant, it should have found that the Complaint presents sufficient facts to overcome the presumption of validity inherent in a rational basis review, and as such the District Court should have denied Appellee's Motion. *See Williams*, 2019 WL 354704 at *13 (holding that a rational basis review was premature where the complaint on its face did not provide sufficient facts to determine there was a rational relationship between the government's actions and its legitimate goals); *Stamas*, 2010 WL 2556560 at *4-6

(refusing to dismiss equal protection claim where the documents in the record were insufficient to establish the facts the County relied on to assert that their actions were rationally related to a legitimate government interest); *Sacramento County Retired Employees*, 2012 WL 1082807 at *5-6 (denying motion to dismiss where the facts in the complaint and documents presented questions of fact regarding the rational relationship between the government legitimate interest and its actions).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, Appellee's motion for judgment on the pleadings denied, and the case remanded for further proceedings.

Dated: April 4, 2022

By: */s/ Aaron Siri*
Aaron Siri
Siri & Glimstad LLP
200 Park Avenue, 17th Floor
New York, NY 10166
Tel: (212) 532-1091
Fax: (646) 417-5967
aaron@sirillp.com

Caroline Tucker
Siri & Glimstad LLP
700 S. Flower Street
Suite 1000
Los Angeles, CA 90017
Tel: (213)376-3739
ctucker@sirillp.com

*Attorneys for Plaintiff-Appellant*
AARON KHERIATY, M.D.

## STATEMENT OF RELATED CASES

Plaintiff-Appellant is not aware of any related cases pursuant to Federal Rule of Appellate Procedure 28-2.6.


DATED: April 4, 2022                                  _/s/ Aaron Siri_
                                                      Aaron Siri

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.  This brief contains 11,783 words**,** excluding the items exempted by Fed. R. App. P. 32(f), and complies with the word limit of Cir. R. 32-1.  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).


DATED: April 4, 2022                              By: _ /s/ Aaron Siri_
                                                              Aaron Siri

**CERTIFICATE OF SERVICE**

I hereby certify that on **April 4, 2022**, I electronically filed the foregoing **Appellant's Opening Brief** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


Dated: April 4, 2022                               By:   */s/ Aaron Siri*
                                                          Aaron Siri